394 A.2d 519

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Russell E. WILLIS, Jr., Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 21, 1978.

Decided Nov. 18, 1978.

22

Lester G. Nauhaus, John H. Corbett, Jr., John R. Cook, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Charles W. Johns, Asst. Dist. Attys., Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

On May 21, 1976, Russell E. Willis, Jr., appellant, was convicted by a jury in Allegheny County of murder of the third degree and robbery with a weapon. Post-verdict motions were denied; judgments of sentence of two concurrent terms of imprisonment for ten to twenty years were imposed. These appeals followed.

Willis advances two arguments which respectively seek discharge or the grant of a new trial.

■ In support of his request for discharge, Willis argues the evidence presented at trial was insufficient to support the verdict. Specifically, Willis asserts the Commonwealth's evidence failed to establish his participation in the crimes

and merely showed his presence at the scene. He acknowl-edges the sufficiency of the Commonwealth's evidence to convict if a statement given to the police and introduced into evidence at trial is considered because it ". . . con-nect[ed] . . . Willis to the commission of the crimes"; but, Willis would have us disregard the statement in evaluating the sufficiency of the evidence because it was allegedly illegally obtained and should have been suppressed. This we may not do. In evaluating the sufficiency of evidence to support a conviction,

". . . the test is 'whether accepting as true all the evidence upon which, if believed, the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime charged.' *Commonwealth v. Kravitz*, 400 Pa. 198, 201, 161 A.2d 861, 862 (1960) and cases cited therein. Moreover, in passing upon such a motion, all evidence actually received must be considered, whether the trial rulings thereon were right or wrong. *Commonwealth v. Tabb*, 417 Pa. 13, 207 A.2d 884 (1965). Although we are of the opinion that the evidence can support the verdict even without the improperly admitted evidence which we shall discuss with regard to the new trial motion, it is clear that the evidence can be considered on the motion for arrest of judgment."

*Commonwealth v. Crews*, 429 Pa. 16, 18–19, 239 A.2d 350, 352 (1968). Accord *Commonwealth v. Terenda*, 433 Pa. 519, 252 A.2d 635 (1969).

The statement given by Willis to police and introduced into evidence at trial clearly established Willis' active participation in the crimes involved and, as Willis concedes, when it, as well as the other evidence, is considered, the evidence is clearly sufficient to establish his guilt beyond a reasonable doubt. Hence, Willis' request for discharge must be denied.

In support of his request for a new trial, Willis argues the evidentiary use of the statement at trial constitutes reversible error because it was obtained in violation of his constitutional rights. The facts and circumstances of the crimes and

of the obtaining of the statement from Willis as established by the Commonwealth's evidence are as follows:

On the evening of October 17, 1975, at approximately 9:15 p. m., James C. Johnson, Thomas Kearney, and John Chmill, left the state store at 704 Larimer Avenue, Pittsburgh, where they were employed, and proceeded to Kearney's automobile which was parked a short distance away. As they entered the vehicle and Johnson attempted to close the passenger front door, he was precluded from doing so by a shotgun which was stuck into the car by one John Gates. Gates and Robin Bey, who were outside the car on the passenger's side, then began to demand money from Johnson and his two companions. The three tried to explain they had no money from the state store, and Johnson began to push Gates away from the car and to close the door. A few seconds later, a handgun was stuck in the passenger door by Bey, who said: "Don't move or I will blow you away." Within another few seconds, Bey fired the handgun at Johnson fatally wounding him. Reuben Peoples, who was outside the car on the driver's side, then demanded and received the car keys from Kearney, who was in the driver's seat. Peoples handed the keys to Willis, who was also on the driver's side of the car, and Willis opened the trunk of the car. Willis then informed the others "there was nothing there," and the four fled on foot.

The next day, at approximately 12:40 p. m., Robin Bey surrendered to police at the Public Safety Building. He admitted shooting Johnson and implicated John Gates, a man called Rue, and another man whose name he did not know. As a result of this information, Gates was arrested on the evening of October 18. Gates initially told police he was in the company of Willis the previous night at a location other than where the crimes occurred. As a result of this information from Gates, Officers Carter and Diggs were dispatched to Willis' residence. Upon arriving there, the officers explained what Gates had said, and Willis agreed to accompany them to the Public Safety Building.[1] At approx-

1. Willis was accompanied by a friend, Michael Williams.

imately 8:30 p. m., Willis arrived at the Public Safety Building, was accompanied by Carter to an empty office (room 222), and was asked to have "a seat in here." Carter then proceeded to the Homicide Office and learned, for the first time, that Willis was then a suspect having been implicated in the crimes by Gates after Carter and Diggs had left to verify Gates' initial statement of alibi.[2]

At 8:37 p. m., Officers Ronald B. Freeman and John Swearingen moved Willis to an adjoining room, advised him he was under arrest, and advised him of his constitutional rights as mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Willis indicated an understanding of his rights and a desire to waive them; and, during questioning that followed, he admitted participation in the robbery involved. This period of questioning ended by 9:06 p. m., but during it no formal statement was taken from Willis.

At 9:35 p. m., Willis was taken to the Homicide Office where he was arraigned at 10:33 p. m. on the murder charge, and, at 11:15 p. m., he was taken to the City Court where he was arraigned on the robbery charge. At neither arraignment did he request counsel, although he was advised of his rights. At 11:28 p. m., Willis phoned and spoke with his mother. At 11:43 p. m., Willis was visited by his father, aunt, brother, and girl friend. Willis gave the written informations he had received during the arraignments to his father; Freeman explained to Willis' father the charges and the evidence the police had, and discussed with him the felony murder rule. Willis' father urged his son to give a formal statement.

At 12:25 a. m., on October 19, Willis' visitors left, and Willis was again advised of his rights. Between 12:31 a. m. and 12:48 a. m., Willis waived his rights and made a second statement admitting participation in the robbery. This

2. The officers, to whom Gates implicated Willis after Carter and Diggs departed but before they returned, attempted to contact Carter and Diggs and advise them of Gates' implication of Willis before their return, but were unsuccessful in doing so.

26

statement was recorded on tape. A pretrial motion to suppress the tape of the recorded statement was denied after an evidentiary hearing, and it was introduced into evidence at trial and played before the jury.

Willis argues the suppression court erred in ruling the statement was admissible claiming he was denied his right to counsel. Willis testified at the suppression hearing that, when placed in room 222, Officer Carter advised him of his rights; that he told Carter he wanted counsel; and, that this request was ignored. Willis reasons that, since Officer Carter did not testify at the suppression hearing, his testimony that he requested counsel of Carter was uncontradicted, and that the Commonwealth thus failed to meet its burden of proving an effective waiver of his right to counsel during the police questioning. Willis also testified that moments later, when he was advised of his rights by Officer Freeman, he again requested counsel, and that his request was ignored. Officer Freeman specifically contradicted this testimony. In support of his argument, Willis cites *Commonwealth v. Kichline*, 468 Pa. 265, 280–81, 361 A.2d 282, 290 (1976), where we said that on appeal from an order denying a motion to suppress, we

". . . will consider only the evidence of the prosecution's witnesses and so much evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted."

Willis' reliance on *Commonwealth v. Kichline*, supra, is misplaced.

First, the standard of review which we are asked to apply is that which is used "*[w]here there are no explicit findings, or in the case of lacunae among the findings.*" *Commonwealth v. Sparrow*, 471 Pa. 490, 498 n. 5, 370 A.2d 712, 716 n. 5 (1977). [Emphasis in original.] Instantly, the suppression court specifically found that Willis never requested counsel before questioning began and that Willis' testimony, which indicated not only that he requested counsel when warned by Carter, but also that he requested counsel when warned

by Freeman, was not to be credited.[3] We are bound to accept such explicit findings of fact unless they are wholly lacking support in the evidence. *Commonwealth v. Sparrow*, supra at 498 n. 5, 370 A.2d at 716 n. 5. The court's finding that Willis never requested counsel from either Carter or Freeman has support in the record because Freeman specifically contradicted Willis' testimony as to requesting counsel from Freeman, and because the testimony, taken as a whole, clearly supports an inference of fact that Willis never requested counsel from Carter. This is so because the testimony shows Carter, prior to terminating all contact with Willis, never considered him a suspect, only an alibi witness. Furthermore, the court's finding that Willis' testimony, that he requested counsel from Carter, is not to be credited is supported by the testimony which indicates he was warned of his rights on numerous other occasions but never requested counsel, and by other testimony which directly contradicts certain portions of Willis' testimony. Finally, the suppression court, since it hears the testimony and views the witnesses, passes on credibility.

Second, even if we were to accept Willis' position that his testimony regarding a request for counsel made to Carter must be reviewed in accordance with the standard discussed in *Commonwealth v. Kichline*, supra,[4] we believe his testimo-

3. The suppression court entered its decision and order denying suppression orally at the end of the suppression hearing. As recorded, the court's decision and ruling do not indicate the court's specific findings; but, the post-verdict motion court's opinion, authored by the same judge who presided over the suppression hearing, states:
   "[Willis'] argument is based on the premise that he requested counsel at two different occasions within a few minutes after he was brought to the Public Safety Building on October 18, 1975.
   "The Court, at the suppression hearing, concluded that from the totality of the surrounding circumstances [Willis'] testimony in this regard was not credible and refused to suppress the taped confession."

4. The assumption is made only to afford Willis the greatest possible benefit he could receive from the failure of the suppression court to fully detail its findings with its order at the conclusion of the suppression hearing. But, in making the assumption, we do not imply that, where, as here, a judge who presides over the hearing details his findings in an opinion disposing of post-verdict motions

28

ny was indeed contradicted if the record is fairly read in its entirety. While Carter did not testify at the suppression hearing and thus did not expressly contradict the testimony of Willis,[5] other testimony at the suppression hearing does contradict Willis. First, the testimony showed Carter was detailed to deal with Willis as an alibi witness; hence, he would not have had any reason to warn him of his rights as testified to by Willis. Second, the record shows Carter did not learn Willis had been implicated until after he and Carter had arrived at the Public Safety Building, and Carter had turned Willis over to Freeman's charge. Third, Willis testified he requested counsel from Freeman very shortly after requesting it from Carter; yet, Freeman specifically contradicted Willis as to this. Finally, on numerous other occasions, Willis was warned of his rights but did not request counsel.[6] Accordingly, the record, read as a whole, contradicts Willis' testimony that he requested counsel from Carter. Hence, the suppression court did not err in ruling the statement was admissible, and Willis' request for a new trial must be denied.

Judgments of sentence are affirmed.

ROBERTS, NIX and MANDERINO, JJ., concur in the result.

rather than with his order denying the motion to suppress, we will or will not disregard the specific findings. That issue can await another day. But we do take this opportunity to encourage our courts to detail specific findings when passing on motions to suppress.

5. Carter did testify at trial and there expressly contradicted Willis' testimony; but, for purposes of our disposition herein, we shall not consider that testimony, although, as in *Commonwealth v. Smith*, 470 Pa. 220, 226 n. 3, 368 A.2d 272, 275 n. 3 (1977), we refrain from now deciding whether such trial testimony should or should not be considered.

6. In this respect, Willis testified he understood his rights when advised of them, and, in particular, he understood the meaning of his right to remain silent.