J-S38015-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES FOY BULLARD | : | |
| | : | |
| Appellant | : | No. 251 EDA 2023 |

Appeal from the Judgment of Sentence Entered January 13, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003341-2019

BEFORE:   LAZARUS, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.:               **FILED DECEMBER 20, 2023**

James Foy Bullard appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, after the trial court convicted him of persons not to possess firearms,[1] firearms not to be carried without a license,[2] and carrying firearms on public streets or public property in Philadelphia.[3]  After careful review, we affirm the convictions, but vacate the judgment of sentence as illegal, and remand for resentencing.

On January 19, 2019, police responded to a report of a gunpoint robbery outside a pharmacy located on Lancaster Avenue in Philadelphia.  Detective

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 6105(a)(1).

[2] *Id.* at § 6106(a)(1).

[3] *Id.* at § 6108.

Jonathan Eves interviewed the complainant and subsequently reviewed pharmacy surveillance footage as part of his investigation. The footage revealed an individual with a gun taking a passerby's backpack. Following circulation of a still image from the surveillance footage, investigators reviewed photos of possible suspects and determined that Bullard's photograph was consistent with the individual depicted in the footage.

On February 26, 2019, Detective Eves interviewed Bullard about the alleged robbery. On that day, Bullard was in the Philadelphia Industrial Correctional Center (PICC) on another unrelated matter and was transported by police to a police station located at 5510 Pine Street, in Philadelphia, to be interviewed by Detective Eves. Bullard's interview was recorded.

At the beginning of the interview, Detective Eves advised Bullard of his *Miranda*[4] rights. Bullard acknowledged that he understood his rights both verbally and in writing. Detective Eves showed Bullard video of the interior and exterior of the pharmacy where the alleged robbery took place. Bullard identified himself in the video, but answered no further questions when Detective Eves asked if Bullard committed a robbery. Detective Eves ended the interview and Bullard was subsequently charged with robbery and related offenses. The next day, Detective Eves executed a search warrant at Bullard's home, but was unable to recover any proceeds from the alleged robbery.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Also of significance, on February 5, 2019, approximately two and a half weeks following the instant alleged robbery, a search warrant had been executed at Bullard's home following an unrelated gunpoint robbery on the same day. The search warrant yielded a silver firearm and two boxes of ammunition. On or about that day, Bullard was charged with robbery, and related offenses. Ultimately, the charges against Bullard in the February 5, 2019 robbery were eventually withdrawn on April 5, 2019.

Prior to the commencement of trial in the instant case, Bullard requested to represent himself *pro se*. On October 23, 2019, the trial court held a *Grazier*[5] hearing and determined that Bullard's decision to waive his right to counsel was done knowingly, intelligently, voluntarily, and of his own free will. *See* N.T. *Grazier* Hearing, 10/23/19, at 12. On November 12, 2019, Bullard filed a multi-part motion to suppress on the theories that the search of his residence was done without probable cause, that he was denied his right to counsel, and that his trial was unnecessarily delayed. On February 11, 2020, the Honorable Roxanne Covington held a hearing on Bullard's motion.

During the hearing, the motion court heard testimony from Detective Eves about Bullard's interview and watched the corresponding video. *See* N.T. Motion Hearing, 2/11/20, at 24-27. Detective Eves testified that when Bullard arrived for questioning, Detective Eves explained that Bullard was there to answer questions about a robbery and that he first had to be

_____

[5] *Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998).

Mirandized. *Id.* at 30. Detective Eves further testified that he was not informed by other officers that Bullard had requested counsel during transport, neither did Bullard make mention of his desire for counsel before entering the interrogation room. *Id.* at 32.

The court also heard testimony from Bullard, who stated that he was taken from the jail to a police station, but was not informed why he was being taken to the station. *Id.* at 34. Before arriving at the police station, Bullard testified that he asked the officers transporting him to call his attorney, but the officers informed him that he did not need an attorney. *Id.* at 35. On cross-examination, however, Bullard testified that he did not request an attorney prior to speaking with Detective Eves. *Id.* at 38. At the conclusion of argument, Judge Covington denied Bullard's suppression motion, stating that "[a]fter careful review of the testimony and evidence presented in this case, [Bullard's] motion to suppress [his] statement of self-identification is denied as evidence[d] by video [showing Bullard was] properly [M]irandized and waived [his] right to counsel." *Id.* at 41.

On September 20, 2021, while represented by counsel,[6] Bullard's non-jury trial commenced before the Honorable Kai N. Scott. The court heard testimony from Detective Eves as to his investigation of the robbery. *See*

_____

[6] During a hearing on August 26, 2021, Bullard expressed that he would like to be represented by counsel at his non-jury trial, particularly Joel Krantz, Esquire, his stand-by counsel during pre-trial procedures. *See* N.T. Motion Hearing, 8/26/21, at 49-53. The trial court confirmed that Bullard wished to proceed with counsel at the outset of the non-jury trial. *See* N.T. Non-Jury Trial, 9/20/21 at 4-5.

N.T. Non-Jury Trial, 9/20/21 at 11-12. Detective Eves also testified that he knew Bullard was represented by counsel in the unrelated February 5, 2019 robbery case for which Bullard had been in custody at the time Detective Eves sought to interview Bullard about the instant case. *Id.* at 22. Detective Eves stated that, despite knowing that information, he still had Bullard brought to the police station for an interview. *Id*. The court also heard from Detective Idris Amir, who was involved in the investigation of the unrelated gunpoint robbery and conducted a search of Bullard's residence, pursuant to a search warrant, wherein he recovered, among other items, a handgun and two boxes of live rounds. *Id.* at 26-28. At the close of argument, Judge Scott found Bullard guilty of the three aforementioned gun-related charges.[7] Sentencing was deferred for a presentence investigation report and mental health evaluation.

On November 18, 2021, the court sentenced Bullard to 6 to 23 months' incarceration for persons not to possess firearms, with no credit for time served, two years' reporting probation for firearms not to be carried without a license, and no further penalty for carrying firearms on public streets or public property in Philadelphia. *See* N.T. Sentencing Hearing, 11/18/21, at 23-24.

Bullard filed a motion for reconsideration of sentence *nunc pro tunc* on December 17, 2021. On the same day, the trial court vacated Bullard's

---

[7] Judge Scott found Bullard **not guilty** of robbery, theft, receiving stolen property, possession of the instrument of a crime, and simple assault.

sentence and scheduled a hearing on the motion.[8]  Following a hearing, the court denied Bullard's motion and reimposed his sentence on January 13, 2022.  **See** N.T. Motion Hearing, 1/13/22, at 14-15.

On January 12, 2023, Bullard was before Judge Scott again for a hearing on a violation of probation (VOP) in the instant matter.  Bullard stated that, after his sentence was reimposed following the denial of his reconsideration motion, he believed that his trial attorney, who had not represented him at his motion for reconsideration,[9] was going to file a direct appeal.  **See** N.T. VOP Hearing, 1/12/23, at 6-8.  During the VOP hearing, the court instructed the Defender Association of Philadelphia to file a motion to reinstate Bullard's appellate *nunc pro tunc* rights due to no appeal being filed during the appropriate time period.  **See id.** at 22.  Judge Scott reappointed the Defender Association, who had represented him during trial, to represent Bullard.  **See id.**; **see also** Short Certificate, 1/12/23.  Subsequently, counsel made an oral

---

[8] Bullard's post-sentence motion was not filed within the 10-day limit required by Pa.R.Crim.P. 720(A)(1).  However, the trial court expressly granted Bullard's request to file a *nunc pro tunc* post-sentence motion within 30 days of the imposition of his sentence.  **See Commonwealth v. Capaldi**, 112 A.3d 1242, 1244 (Pa. Super. 2015) (time for filing notice of appeal tolled where trial court expressly granted filing of *nunc pro tunc* post-sentence motion within 30 days of imposition of sentence).  Accordingly, Bullard's *nunc pro tunc* post-sentence motion was timely.

[9] Bullard was represented by private counsel at the reconsideration hearing. However, that counsel did not inform Bullard as to the outcome of the hearing and did not represent him beyond that hearing.  **See** N.T. VOP Hearing, 1/12/23, at 5-6.

motion to reinstate Bullard's appellate rights *nunc pro tunc*. **See** N.T. VOP Hearing, 1/12/23, at 23. The court accepted the oral motion, and, on January 13, 2022, the court ordered that Bullard's appellate rights be reinstated *nunc pro tunc*. **See** Order, 1/18/23.

On January 23, 2023, Bullard filed a *nunc pro tunc* notice of appeal.[10] Bullard raises the following issue for our review:

> Did not the court err in failing to suppress Bullard's subsequent statement despite his **Miranda** waiver where Bullard, was incarcerated on an unrelated offense and asked transporting police to allow him to call his lawyer before taking him to be questioned by detectives, and officers refused and told him that he did not need a lawyer? **See Miranda**, **supra** (right to counsel under Fifth Amendment when person in custody and subjected to police interrogation).

Appellant's Brief, at 3 (reworded for clarity; footnote omitted).

Bullard's claim that the court erred in denying his motion for suppression is two-fold. First, he claims that the court erred because he had already invoked his right to an attorney prior to questioning by Detective Eves. **Id.** at 18-19. Second, he claims that the court erred by not placing findings of fact and conclusions of law on the record at the conclusion of the suppression hearing. **Id.** at 21-22.

_____

[10] It does not appear that the trial court ordered Bullard file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Moreover, a review of the docket indicates that no concise statement was filed. Judge Scott is no longer on the bench in Philadelphia. On February 22, 2023, the appeals unit of the trial court sent a letter that no Rule 1925(a) opinion would accompany the file.

Initially, we note our standard of review of the denial of a suppression motion. In reviewing the denial of a suppression motion,

> [w]e may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

*Commonwealth v. Hampton*, 204 A.3d 452, 456 (Pa. Super. 2019). Such an inquiry must take into account the totality of the circumstances. *Commonwealth v. Delvalle*, 74 A.3d 1081, 1085 (Pa. Super. 2013). Additionally, it is exclusively within the province of the trial court to determine the credibility of the witnesses and the weight to be accorded their testimony. *Commonwealth v. Fitzpatrick*, 666 A.2d 323, 325 (Pa. Super. 1996). If the evidence supports the findings of the trial court, we are bound by such findings and may reverse only if the legal conclusions drawn therefrom are erroneous. *Id*.

Our Supreme Court has repeatedly stated that:

> in *Miranda*, the United States Supreme Court determined that in order to protect the Fifth Amendment privilege against self-incrimination from the inherently compelling pressures of custodial interrogation, "if an individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 473 []. In *Edwards* [*v. Arizona*, 451 U.S. 477, 484 (1981)], the Court determined that additional safeguards for the *Miranda* right to counsel were necessary and held that once a suspect asserts the right, he may not be further interrogated "until counsel has been made available to him []." [I]n *Minnick* [*v. Mississippi*, 498 U.S. 146, 153 (1990)], the

Court clarified the **Edwards** rule by holding that "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney."

**Commonwealth v. Marinelli**, 690 A.2d 203, 215 (Pa. 1997). Specifically, **Edwards** is "designed to prevent police from badgering a defendant into waiving his previously[-]asserted **Miranda** rights." **Commonwealth v. Champney**, 65 A.3d 386, 401 (Pa. 2013) (quoting **Minnick**, 498 U.S. at 150).

In the present case, Bullard testified at the suppression hearing that on February 26, 2019, while incarcerated on an unrelated matter at PICC, two officers told him to get dressed and transported him to a police station located at 5510 Pine Street in Philadelphia. **See** N.T. Motion Hearing, 2/11/20, at 34. Upon arriving to the station, Bullard was placed in a holding cell until Detective Eves moved him to an interrogation room. **Id.** at 35. Bullard testified that, prior to being questioned by Detective Eves, he asked for an attorney. Bullard stated that he asked the officers who retrieved him from PICC, when he met them in the receiving room at PICC, if he could contact an attorney, to which he was told that he did not need an attorney.[11] **Id**. Specifically, Bullard testified that he asked Officer Jeremy Duff if he could contact an attorney while in the receiving room at PICC. **Id**. On cross-examination at the suppression hearing, however, the following exchange occurred:

---

[11] Bullard also stated that he did not make any statements to the officers while in transport from PICC to 5510 Pine Street. **See id**.

[Commonwealth:] Sir, let me try this again. I asked you very simple question. Did you ask for a lawyer? I'm not talking about going in your house[.]

[Bullard:] Okay.

[Commonwealth:] Did you ask for a lawyer on this day prior to talking to the detectives?

[Bullard:] Did you just see what I said and signed?

[Commonwealth:] It's a yes or no question.

[Bullard:] No.

*Id.* at 38.

Bullard, *pro se* at the suppression hearing, presented no additional evidence to support his motion. Detective Eves testified on behalf of the Commonwealth and stated that he had Bullard brought to 5510 Pine Street for questioning about the instant case. *Id.* at 25-26. Detective Eves testified that prior to questioning Bullard, he provided Bullard with his **Miranda** warnings, showed Bullard a video purporting to show a robbery, and that Bullard identified himself in the video. *Id.* at 26. At that point, the Commonwealth played the recording of the interview to the suppression court. *Id.*; **see also** Commonwealth Exhibit 1, at 26. A review of this video shows Detective Eves and a second detective interviewing Bullard. At the outset, Bullard asked both detectives for business cards and then stated they may "proceed." Interrogation Video, 2/26/19, at 11:52:51. Detective Eves informed Bullard he was investigating a robbery on Lancaster Avenue and wanted to speak with Bullard about it. Before asking him any questions,

- 10 -

Detective Eves stated that he had to "Mirandize [Bullard] first." *Id.* at 11:53:00. Detective Eves then presented a written statement and read the statement to Bullard, at the conclusion of which he asked Bullard if he understood "everything that [he] just read to [him]." *Id.* at 11:53:01-11:54:05. Bullard verbally acknowledged that he understood everything and then signed the acknowledgement. *Id.* at 11:54:15.

Detective Eves then placed a laptop in front of Bullard, with surveillance video of the alleged robbery cued-up. *Id.* at 11:54:40. Detective Eves explained where the surveillance video was from and, at that moment, Bullard voluntarily stated "that's me" several times. *Id.* at 11:54:48-11:55:02. Detective Eves attempted to ask Bullard several more questions about the alleged robbery for the next five minutes. Bullard declined to answer Detective Eves's questions and the interview concluded at 12:00:18.

During cross-examination, Detective Eves stated that the officers who transported Bullard to the police station never informed him that Bullard had requested counsel prior to arrival. *See* N.T. Motion Hearing, 2/11/20, at 32. In addition, Detective Eves testified that Bullard never made "mention of any counsel" prior to entering the interrogation room. *Id*. Neither of the two officers who transported Bullard from PICC to the police station testified at the suppression hearing. *Id.* at 32-33.

At the conclusion of the suppression hearing, the court stated: "After careful review of the testimony and evidence presented in this case, the

- 11 -

defendant's motion to suppress [his] statement of self-identification is denied as evidence[d] by video [that the defendant was] properly *[M]irandized* and waived [his] right to counsel." *Id.* at 41.

Our review of the record confirms that the trial court's findings are supported by the record, and its ruling is sound. *See Hampton*, *supra*. The only evidence that Bullard may have invoked his Fifth Amendment right to counsel was Bullard's own testimony, to which, evidently, the court accorded little weight, and was contradictory on cross-examination. Moreover, Bullard conceded, on cross-examination, that he did not at any time request counsel. *See* N.T. Motion Hearing, 2/11/20, at 38. Bullard was clearly informed of his *Miranda* rights, acknowledged such, and told law enforcement to "proceed" with their questions. Bullard identified himself on the video before Detective Eves even had the opportunity to pose a question, and continued to identify himself in the video throughout questioning. Thus, we conclude that Bullard, without provocation or improper questioning from the police, voluntarily and knowingly relinquished his *Miranda* rights. *See Champney*, *supra*; *see also Marinelli*, *supra*. Accordingly, we do not grant Bullard relief on this claim.

The second portion of Bullard's claim is that the court erred by not placing findings of fact and conclusions of law on the record at the conclusion of the suppression hearing, as required by Pa.R.Crim.P. 581(I). *See* Appellant's Brief, at 21-22. Rule 581(I) states:

At the conclusion of the hearing, the judge shall enter on the record a statement of findings of fact and conclusions of law as to whether the evidence was obtained in violation of the defendant's rights, or in violation of these rules or any statute, and shall make an order granting or denying the relief sought.

Pa.R.Crim.P. 581(I).

This issue has been addressed by our Supreme Court in

***Commonwealth v. Millner***, 888 A.2d 680 (Pa. 2005):

[I]t is not uncommon for suppression judges to fail to comply with [Pa.R.Crim.P. 581(I)], and the lapse is then belatedly accounted for, if at all, either in the court's Pa.R.A.P. 1925 opinion filed after an appeal is taken by the aggrieved party . . . or by the [***Commonwealth v. Kichline***, 361 A.2d 282, 290 (Pa. 1976)] standard of review—a standard which came into existence precisely because of such lapses.

***Millner***, ***supra*** at 688. Placing findings of fact and conclusions of law on the record at the conclusion of the suppression hearing serves two purposes. One, "it permits the losing party to make a more intelligent assessment of whether or not to burden the appellate justice system with an appeal of the suppression ruling, particularly in cases of contested evidence." ***Id***. Two, "it is often the case (for example, where a waiver trial occurs) that the suppression judge is different from the trial judge yet, if there is a conviction, it will be the trial judge who will be responsible for preparation of the Rule 1925 opinion for appeal." ***Id.*** at 689. Thus, in instances where the suppression court has failed to make specific findings of fact on the record, this Court has instead relied on the record and the court's Rule 1925(a) opinion. ***See, e.g.***, ***Commonwealth v. Wood***, 833 A.2d 740, 742-43 (Pa. Super. 2003).

Here, there is no Rule 1925(a) opinion, and the trial judge was not the same judge who heard the suppression motion. Still, while we disapprove of the suppression court's failure to place specific findings of fact and conclusions of law on the record, "remand for compliance would not serve the interests of judicial economy or justice." *Millner*, 888 A.2d at 689. The evidence presented at the suppression hearing, discussed in detail above, established by a preponderance of the evidence that Bullard's statement was voluntary, and that the waiver of his *Miranda* rights was knowing and intelligent. *See Kichline*, 361 A.2d at 290. Thus, the record is sufficient to allow meaningful appellate review. Accordingly, we affirm the court's denial of Bullard's suppression motion. *See Milner*, *supra*; *see also Kichline*, *supra*.

However, in our review of the record it became apparent that the trial court failed to award time credit to Bullard. Such an error constitutes an illegal sentence. *See Commonwealth v. Gibbs*, 181 A.3d 1165, 1166-67 (Pa. Super. 2018) (trial court's failure to award credit for time served implicates legality of sentence). It is well-settled that an illegal sentence must be vacated and that we can raise and review an illegal sentence *sua sponte*. *Commonwealth v. Muhammed*, 992 A.2d 897, 903 (Pa. Super. 2010). The Pennsylvania Sentencing Code provides that credit "**shall be given** to the defendant for all time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of conduct on which such a charge is based." 42 Pa.C.S.A. § 9760(1) (emphasis added). This includes "credit for the time spent in custody prior to trial, during trial, pending

- 14 -

sentence, and pending the resolution of an appeal." ***Id***. "The principle underlying [section 9760] is that a defendant should be given credit for time spent in custody prior to sentencing for a particular offense." ***Commonwealth v. Hollawell***, 604 A.2d 723, 725 (Pa. Super. 1992).

There is no dispute that Bullard did not receive credit for his time incarcerated related to this crime prior to his conviction. ***See*** N.T. Sentencing Hearing, 11/18/21, at 19-20, 23-24; ***see also*** Sentencing Order 11/19/21. The sentencing court acknowledged that Bullard had been in custody approximately two years and eight months prior to sentencing on these charges. ***See*** N.T. Sentencing Hearing, 11/18/21, at 7-8, 19. Placing her sentence on the record, Judge Scott stated that she did not "want to send [Bullard] upstate . . . . [because he does not] do well upstate." ***Id.*** at 23. The court sentenced Bullard to an aggregate term of 6 to 23 months' incarceration "with no credit for time served" and two years' reporting probation. ***Id***.

The sentencing court's failure to give Bullard credit for time served, amounting to almost three years, is illegal pursuant to section 9760(1). While we understand the court's reasoning for the sentence it imposed, we are constrained to vacate Bullard's sentence and remand for resentencing in accordance with the Pennsylvania Sentencing Code.[12]

_____

[12] We recognize the sentencing court's desire for Bullard to serve his sentence in county jail, rather that state prison, to better his chances of rehabilitation
*(Footnote Continued Next Page)*

Convictions affirmed.  Judgment of sentence vacated.  Case remanded for resentencing in accordance with the dictates of this decision. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/20/2023

---

and lessen his likelihood of re-offending.  However, we note a sentencing court's ability to designate a defendant to serve a term up to five years in county jail.  *See* 42 Pa.C.S.A. § 9762(a).  Finally, our review of the record indicates that Bullard was released from county jail after six months and has been on supervision since his release.